Aventis Pharma SA v. Amphastar Aventis Pharma SA v. Amphastar Aventis Pharma SA v. Amphastar It's not a classic credibility case. While the district court mentioned a lack of credibility in the arguments numerous times in her opinion, what this case is really about are clearly erroneous findings of fact on which those credibility findings were made. There was no finding that Dr. Uzan's demeanor suggested that he was lying, that he was not telling the truth. It was all based on fact-finding, and we submit that fact-finding was clearly erroneous over and over and over again. Can I ask one other question just before we hit intent too hard? Since our Federal Circuit ruling, this has been reissued without example 6. Does that affect materiality? Your Honor, we'd like to suggest it does, but the case law of this Court suggests that if there is inequitable conduct, you cannot wipe out the inequitable conduct with a reissue. And so we're not arguing that, and the reissue part of this case was bifurcated from the issues that Judge Felser dealt with. All that does show is that the examiner allowed these claims without example 6, without Dr. Uzan's declarations, but we're not relying on that in all fairness to the issues in the case. At the heart of the District Court's findings, which we suggest were clearly erroneous, were two basic findings, which she repeated over and over again. One was that the central question of patentability dealt with compositional difference, and two, that Dr. Uzan tried to overcome that through a half-life finding. She mentioned the compositional difference point 19 times in her opinion. I prepared a paper and listed them over and over again. And if you look at those findings, you'll find that underlying her findings of no credibility were those two reasons over and over and over again. The fact is that the central question involved in this case was not compositional difference. It was not only Section 102. In the first two office actions, there were two rejections, basically two that are relevant to this case. One was on what some people call Mardigian and what some people call EP 144. That was a 102 rejection. There was also a 103 rejection. Those were independent rejections. She may have asked for the same kind of proof, but they were independent rejections. And the proof of the pudding is in the third office action, because in the third office action, the examiner withdrew the Section 102 rejection, notwithstanding the District Court's comments to the contrary. She withdrew that rejection, and she interposed only a Section 103 rejection. But, counsel, at the time of the second office action, you agree completely, I'm sure, that both 102 and 103 were pending. In the first and second, they were both pending. And so in Dr. Uzan's very first declaration filed after the second office action, in paragraph numbered 8, is where he discusses the half-life differences or similarities, differences in this case, between the two, and then goes on and also talks in more detail about what I'm sure you would characterize thereafter as compositional differences as well. I'm on page 7 of his declaration, paragraph number 8. It's at A1099 of your appendix, if that helps. Yes, I have that. Okay. Paragraph 8. So the first half of paragraph 8 is the half-life discussion, correct? That's correct. Yes. And the second half of paragraph 8 is the discussion of what you would probably term compositional differences? Yes. Yes. Okay. And so your argument on appeal is that the District Court erred in concluding that the first half of numbered paragraph 8 similarly pertained to compositional differences. Your argument, as I understand it, that that is all going to whether the properties were different for obviousness purposes. Exactly. Yeah, but how are we supposed to tell that? Because unfortunately, Dr. Ouzian didn't articulate any sort of separation between the two paragraphs. They're even both under number 8. It's not even separated in terms of 102 and 103. How can we find it's clearly erroneous? I may agree with you if this were de novo review, but clearly erroneous is a pretty deferential standard, and I just don't see anything in this particular declaration that would suggest to me that this argument was meant by Dr. Ouzian to only apply to 103. So that's where I need your help. Your Honor, let me respond to that. First of all, it is clear that the examiner appreciated the difference. Wait, but isn't it equally clear that your own attorney prosecuting this didn't appreciate the difference? That's exactly right. The examiner did not, the attorney did not appreciate the difference, and our comment on that. So how can I find it clearly erroneous when the attorney who prosecuted this on behalf of your client thought that applied to 102? Because there's no evidence that the attorney knew that there were different doses, and there is no evidence that Dr. Ouzian knew that the attorney was making those statements. The inequitable conduct finding in this case is directed to Dr. Ouzian. I agree, but the district court found, as a matter of fact, that when Dr. Ouzian wrote this, he meant both the first paragraph and the second paragraph to apply to compositional differences. That's a fact finding, and even your own attorney thought both paragraphs did. So it's really hard for me to say the district court is clearly erroneous in that conclusion. The reason that Judge Felser found that was based on her clearly erroneous finding that the only question in the case, even through the third office action, was compositional difference, coupled with her finding that Dr. Ouzian knew that he could not distinguish compositional differences. Show me, counsel, where she said the only thing pending after the second office action was the issue of compositional difference, because if that's correct, that may change my thinking, and that's what I thought I just understood you to say. And I didn't see that. I didn't see in her opinion where she said the only thing Dr. Ouzian was supposed to be rebutting was compositional differences. Your Honor, I have a list of all of the findings in which Judge Felser, 19 times, Judge Felser found that compositional difference was at the heart of the issues in the case. Right, but she didn't ignore, or there's nothing in her opinion that suggests she was unaware of the fact that there was a 103 rejection pending as well, which is what you seem to suggest to me. Because clearly if she erred and said no, the only rejection made was 102, therefore this must have gone to 102, I think that you might even make your case for clearly erroneous, but that's not what I understand her to have done. She did say that, Your Honor, with due deference. She said the 103 rejection was subsumed within the 102 rejection. She said over and over again, she thought that the examiner was still making a 102 rejection in the third office action. Can you show us right where that is, Mr. Gunner? Pardon? Can you show us right where that is? Yes. Yes. If you look at page 54... Of her opinion? It doesn't go up to 54 pages. First of all, in footnote 10 on page 20, she says, the issue of obviousness necessarily folds into and is subsumed by inherency. And where she said about in footnote 9 on the same page, but see third office action in which the primary examiner restated her rejections over Mardigian under 35 U.S.C. 103 without expressly restating them under 102, but in no time actually withdrew her rejections over Mardigian under 102. Not having been withdrawn, those anticipation rejections over Mardigian were technically still pending. Thus, Adventist's argument based on the P.E. citations to the Patent Act is specious. And she kept saying, the central issue... Well, you don't have any difference... I mean, you don't differ with her on what she said in footnote 9, right? There's nothing controversial about that, is there? In footnote 9? Yes. Absolutely, Your Honor. What do you disagree... What did she say that was problematic? Obviousness wasn't still pending in the third office action, right? The third office action did not have an anticipation rejection. It had only a 103 rejection. And she said, because it wasn't expressly withdrawn, it must still have included a 102 rejection. That's bad law. So, counsel, maybe that does mean, with regard to the second declaration, where there was clearly only a 103 still pending at that point in time, that we should be concerned about fact findings. But if the first declaration, which we all agree doesn't have that situation, 102 and 103 were clearly pending, why shouldn't we just look at her fact findings with regard to the first declaration after the second office action and say, I can't say that that's clearly erroneous? Because her findings were based on the proposition, if you look at page 820, line 13, thus the central question throughout the prosecution of the 618 patent was whether Debrea and Mardigian EP144 low-molecule weight heparin products were compositionally different. She viewed the entire case from beginning to end as a section 102 case. Where was that again, Mr. Turner? That's on page 820. She talks about the central question. Well, she says that's the central question, but that's different from saying it's the only question that's been at issue. Your Honor, if I can give you the sites to the 19 times when she said, when she referred to the compositional difference question, I've read her opinion over and over again, and I suggest to you with due deference that when you read this opinion, her basic finding is that there was a 102 rejection, that the only way that Dr. Uzan could prove compositional difference under that 102 rejection was through a half-life determination. Well, it's certainly possible one could prove compositional differences by showing a different half-life at the same dosage. We agree with that, right? At the same dosage, yes. Right, right. So it certainly would persuade an examiner, even if there was nothing else in this declaration, this would persuade an examiner if he were to believe the half-life differences are being shown at the same dosage. If he were to believe that, it would persuade him that this overcomes the 102 portion of the rejection. Your Honor, but it did not. It did not because the only way, in the third office action, the examiner withdrew the 102 rejection based on the molecular weight distribution showing. She did not withdraw the 103 rejection because she said the half-life showing was inadequate because it wasn't shown to be statistically significant. Then came the second declaration, and then she withdrew the 103 rejection. So the examiner clearly understood what was happening. She said, okay, I'm withdrawing the 102 rejection based on the molecular weight distribution. That's how you have to read that third office action. Okay, but counsel, people make multiple independent arguments to overcome rejection sometimes, right? So why is the district court wrong in saying both of these arguments in paragraph 8, a single number paragraph, were meant to go at 102 and 103? What's wrong with that sort of determination in this case? Your Honor... And of course, of course, then even after these arguments have overcome 102, you could repeat them again and continue to argue why they should overcome 103. Because the district court judge expressly held that Dr. Mouzan could not prove compositional difference through a molecular weight distribution showing and could only prove it through a half-life showing. And she said this, I'm trying to find out exactly where she said this, on A16 and 17. I believe that's what my notes say. Here it is, bottom of page 16, starting on line 17 or 18. But Aventis could not successfully distinguish debris merely by appealing to debris's ratio of number average and weight average molecular weights. That's the molecular weight distribution thing. The EP144 patent is not limited by a specific ratio of constituents. Rather, it employs open claim language comprising various proportions of particular molecular weight products. Therefore, Aventis attacks sameness based on a difference in properties. In other words, she said he couldn't prove it based on molecular weight difference. He had to prove it based on difference in properties. And that theme courses throughout her opinion. And in fact, the examiner got it right. The examiner said in the third office action, okay, she didn't use these words, but that's the necessary effect of her action. You've given me a molecular weight distribution in the first office act, in the first declaration. That's the only place it was. I'm withdrawing the 102 rejection. I'm maintaining the 103 rejection. And she said you've got to show statistically significant differences in your 103 arguments, your half-life arguments. He filed a second declaration, and then she withdrew the 103 rejection. So the examiner saw the dichotomy. The district court held he couldn't do it. The examiner proved that he could do it, and he did do it. And coursing throughout this opinion, the entire opinion, 19 times she says the central question, the principal question is the compositional difference, the 102 rejection. She looked at the words inherency in the third office action. She said, aha, the examiner is still talking about 102, but the examiner was talking about inherency of properties. Could compositional differences also have an impact on the 103 rejection? The compositional difference... Certainly you would say if two compounds are compositionally significantly different, that would be an argument you would make, wouldn't you, that it's not obvious? Or would you ignore that? It can be used as part of the argument. But the thing is, once you show a compositional difference, then unexpected results are out. This case law of this court and this precedent of this court has made clear that once you show compositional differences, then you don't use unexpected results. That is, if they're different products. The question then is, if they're close enough, and the examiner thought they were very close, then you need to show unexpected properties. She did not find that the compositional difference was enough to knock out 103. She found that the compositional difference was adequate only to knock out 102. He had to make a separate showing in a supplemental declaration, the second declaration, in order to get the 103 rejection knocked out. The district court said that couldn't be done. The district court did not appreciate that... She thought everything was part of the 102 rejection. She did not appreciate that they were separate issues capable of being overturned by separate kinds of proof. The examiner did recognize that, as shown by the Third Office Act. Thank you, Mr. Dunner. We'll move on to Mr. Weir, and then we'll come back to you for rebuttal. Thank you, Your Honor. May it please the Court, I'm actually Francis Lynch. Mr. Lynch, excuse me. Counsel for Retevo Pharmaceuticals, USA, Inc., and I've been designated as the first speaker on behalf of the appellees. We're going to hold you responsible to split up the time. We're not going to pay much attention to that, all right? Certainly, Your Honor. Please proceed. First of all, just because the trial judge was too polite to repeatedly call him a liar doesn't mean that she didn't make findings clearly reflecting the fact that she did not... This all turns on whether 102 or 103 is what's at issue in the Third Office action. The district judge says the central question throughout the prosecution is 102. That's wrong, isn't it? Your Honor... It's not throughout the prosecution. It's gone by the... ...about the word inherency, and you're right. At the end, at the end... In the Third Office action, it's gone, isn't it? Even though there was the word inherency, anticipation... But inherency is not... But that was long after the pattern of deception in this case was fully ventilated. This is just an effort to... The district judge continues the mistake in her footnotes, doesn't she? She says the 102 anticipation rejections were still pending in the Third Office action. That's wrong, isn't it? Your Honor, that probably is wrong, but it doesn't, in fact, provide... If that's wrong, doesn't that show that, indeed, Mr. Ouzan, Dr. Ouzan, was responding to the request for unexpected properties, which is entirely consistent with what he did using doses rather than exact milligram comparisons? Your Honor, they argue that he did not have a nuance. Dr. Ouzan did not have a nuanced understanding of the subtleties of patent law. I'm not worried about their argument. I'm worried about the errors of the court. The facts are that he was an animal biologist. He had no real knowledge of the subtleties of U.S. patent law. We don't need... We're back to the specifics of the case here. The district judge has said that it thought anticipation was pending. If that's an error, your whole case collapses, doesn't it? Your Honor, that's what I... And you just said a minute ago it was an error. You agree? Well, I agree that there was ambiguity and that the correct interpretation is probably that it was gone, but I in no way... You said it was an error. I don't see much ambiguity, but go ahead. I in no way accept the proposition that that collapses the whole case because all of the fraudulent activity... Doesn't that give Dr. Rouzan a full justification for explaining unexpected properties and not making an identicality comparison? Your Honor, at the end, in his third declaration, that might justify it, but does not justify it first in the example 6 where he intentionally disguised the true facts. Instead of taking the mean and the standard deviation that was clearly set forth in the Fouquet and the Dussier reports, he created... Well, Fouquet and Dussier don't list the doses, do they? Oh, Your Honor. He did disclose both studies, gave them. Your Honor, he did not. They're not shown on Fouquet. Your Honor, if I may, please. Please. There's a distinction between the one page of Fouquet that was given after the third office action and the Fouquet report, which is not very large. It's in the appendix. The Fouquet report is very clear that it was a 60 mg dose. They were comparing two different salts of enoxaparin, and they were using the same dose. Similarly in Dussier. It was very clear. There was the 20, there was the 40, there was the 60, and there was the 80 mg doses. If you look at those reports and you see there the key conclusion had to do with the mean and the standard deviation. That was never mentioned until the end. First he started with the presentation in Exhibit 6 with these bogus cut-off concepts that have no support anywhere. And so if you look at Exhibit 6 in the patent, he's talking about somebody over this certain artificially selected cut-off. There was no justification for that, and there was no evidence justifying it. It was pure deceptive conduct. Counsel? Yes. It's hard for me to imagine that a scientist with a pedigree like Dr. Uzan's, who has no personal stake in this litigation, is going to come in and intentionally hide the fact that he applied an analysis with different dosages. That's really hard for me to fathom, given his pedigree. It's really quite fabulous. And he doesn't have anything at stake. And so it's hard for me to imagine that any attorney could lead him like a bull by the horns through a lying declaration. So tell me, how do you convince two district court judges to the contrary? Well, Your Honor, first of all, the second district court judge, of course, observed him, heard him testify, and didn't believe him that his focus was on this quote, clinically relevant dose. Was it because he said things like, I did disclose it in the declaration, I thought I did? I mean, see, that for me was kind of difficult. Well, I'll get to that in a minute. To buy into. But was it because of other things that he did throughout the course of the litigation to sort of try to wiggle around the problem that he confronted himself, was confronted with ultimately? Well, he came up with alternative explanations. The first explanation, which didn't even last through the first appeal, was he said he was favoring the prior art because that had the higher dose. So that was his first explanation. That was totally abandoned. This notion that it was inadvertent, there's no substantive attack on the basis for that finding because he testified it was inadvertent, that there was really no support for it, and she didn't believe him. If we go to- You say there's no support, but again, if we're talking about unexpected properties and not identicality, why isn't he just doing what any scientist would do? I'm showing you that there's some unexpected properties in the clinical doses. Your Honor, there is no contemporaneous evidence supporting the proposition that that was what he was focused on. Well, the contemporaneous evidence is what's before the patent office. Only 103, not anticipation. Your Honor, that's only after the third office action. At the beginning, the first projection was based on 102 slash 103. That's when they argue. Counsel, I'm troubled just like Judge Rader with the second declaration being utilized because clearly 102, he is absolutely right. You've admitted as much. 102 was not still pending after that last office action. But that's why I keep going back and throughout this entire thing to the first declaration because it was clearly pending at that point in time. Yes, Your Honor. And to go back to one of your earlier questions about, well, how could he do this? Well, first of all, of course, he was not an independent expert. He had been employed by Aventis and his predecessors for over 30 years when he submitted the first declaration. And by the time he testified at trial, he had been on their payroll for over 50 years. So there's that background. But there's this constantly shifting. There's first, well, I thought it was favoring them to give them the prior art dose. Then there was this at his deposition and in the first appeal as a footnote in the decision of the panel. It was, oh, I was just focusing on it because it was the preferred therapeutic dose. Well, of course, that's not true. Well, let me ask you. I'm getting a little confused here. Why, if this panel, or at least some members of this panel, perceive the judge as having committed clear error with respect to her findings and conclusions on the second or anything beyond the first office action, then how can we affirm? We don't even know what the district court would have done, do we, in the absence of all of the conduct that occurred after the first office action? I mean, we're here reviewing what the district court said. And if you win, it's presumably because at least we've given some deference to the district court. But if we're sitting here saying that we don't even know, do we know for certain what the district court would have concluded with respect to the case in its entirety if she didn't consider the other office action? I think if you look at her 42 pages and you think about the kind of findings she made about lack of belief and the support for those findings that is ample, then the only reasonable conclusion, I suggest, is that this wouldn't make a difference, that if she was instructed that she had misperceived the third office action, then that would not in any way change her findings that he was deceptive when he presented the data in Exhibit 6 and he was deceptive when he presented it in... How do we know if it wouldn't change her findings? If she really knew that she was considering something that had an alternative reasonable explanation, judges don't just react. She did say in the alternative. She said, even if I'm wrong with regard to this, that that's the sentence after where Mr. Dunnish stopped. Are you talking about page 20, line 15? I believe so, Your Honor, but I just feel a little guilty... Even if the court were to accept as true Eventus's unlikely contention that by the time of the second declaration, blah, blah, blah, there can be no question that adherency was a central dispositive question up to that point? Yes, Your Honor. Is that what you're suggesting directly contradicts and limits the immediately preceding question that the central question throughout the prosecution was this? It conveys her view that even if she was wrong about the meaning of the third office action, she still found him to be not believable. She found his excuses to be not credible and those findings are not clearly erroneous. So she's saying that up until... So even if we throw out the third office action and the second declaration as pertaining only to 103, that she's saying at that point in time it's clear up until that point in time inherency, i.e. 102, was the central issue in dispute and she, therefore, is finding that paragraph 8 applied to 102. Yes, Your Honor. Okay, thank you. Mr. Weir, you have four and a half minutes. In paragraph 10 of her decision cited by Mr. Donner, she doesn't say that... You mean footnote 10. I'm sorry, footnote 10 on page 18, appendix A20. She says that obviousness is evaluated under the guise... Subsumed by inherency. In this case, yes, the MPP specifically provides, and we cited it in our papers, that an examiner can reject a composition, prima facie obviousness, based on inherency under either 102 or 103. Because the office doesn't have the facilities to do the testing that may be required. Exactly, and that's what the examiner did. That's exactly what the examiner did in this case. For the first two offices... But in terms of a court, which can inquire into whatever evidence is available, and must inquire into whatever evidence is available, is inherency and obvious identical? Well, obviousness, as a matter of law... They're different. Well, it depends on whether you... Actually, there's an issue here of how people are using the word inherency. Mr. Donner always uses inherency to mean only anticipation. The question is that inherency can evidence obviousness, so inherency is a matter of law. In fact, the examiner in the third office action used the word inherency, despite the fact that all of us seem to think that he was focusing on 103, right? Well, that's the other issue I'd like to address, because I don't necessarily agree with Mr. Lynch. All the patent office said in the final office action was the claims are rejected over 103 for the same reasons previously stated. Mr. Donner's wrong. She did not say, I specifically withdraw my 102 rejection. She did say they're rejected for the reasons previously stated, which would include all of the arguments she made with respect to 102... I'm reading it right now, counsel. It says claims, blah, blah, blah, I won't say the numbers, are rejected under 103 as unpatentable under Mardiguian, that's the reference we're talking about, right? Correct. Or Lopez, for the reasons of record in the office action. Well, she says under 103 for the reasons in the office action. Correct. And obviousness, obviously, anticipation is the antithesis of obviousness. If they prove obviousness or anticipation, if you prove obviousness, you've got anticipation. Counsel, look a little further in that same thing. You might notice in office action 102, office action 1 and office action 2, she says identical or nearly identical, reflecting the fact that she's talking about 102 or 103. Well, in this one, the words are only nearly identical, reflecting the fact that she's no longer talking about identity. So how can you say 102 is correct? Well, but still, under the Fitzgerald case and the MPP section that talks about 102, 103, they do use that language, identical or nearly identical. So it still could cover a 102, 103 type of judge. She's not citing 102 anymore. That's absolutely correct. In all the other office actions, she referenced 102-103 and then said identical or nearly identical. Here she says 103 and nearly identical. That's absolutely correct. You're really arguing that 102 is still in play at this point? Well, I'm saying that the district court judge cannot commit clear error because there's an ambiguity in the office action where she is saying that I'm rejecting the claims for the same reasons previously stated. Although she says 102, she never specifically withdrew 102. So there is an ambiguity there, but what the district court judge said was, okay, even if I'm wrong, as the court pointed out, well, it's still not believable. And in fact, what she said in footnote 11, she says that at the bottom of page 822, she says the issue here is not compositional difference but patentable compositional difference. And obviousness includes patentable compositional difference. The only reason you are giving evidence of surprising results is to show that there is a patentable compositional difference. So what the judge was saying, actually saying, was absolutely correct. And the absurdity of the argument that Eventus is making here is that comparing the drugs at different dosages doesn't prove superior qualities either. It has nothing to do with proving superior qualities because the results in half-life could be due to the difference in dose, and we know that to be the case because the same-dose comparison in this case showed nothing. So no matter, if you take whatever Rouson says at trial to be true, it still didn't prove anything with respect to patentability, and that's what the district court said. Are you saying, let me just make sure I understand, are you saying she made a fact-finding that even if what he said in the first half of numbered paragraph 8 in that first declaration was meant to go exclusively to obviousness, are you saying she made a fact-finding that that is still inequitable conduct intent? What she said was, she said in addressing the issue, addressing the case on Chubb, she said that their whole argument begs the question of whether or not there is... Where are you in her opinion? Just so I can make sure I understand what it is you're talking about. Because you've lost me. A30. And it's at the very bottom of the page, line 25. But events' reliance on Chubb, which they're relying on to show the surprising results argument, begs the question of whether the 618 low-molecule heparin is in fact superior to the EP144 low-molecule heparin prior in any property, at any dose, for any indication, and is sufficiently to prove both composition difference and non-obviousness. So what she's saying there is, the clear point is, is that it doesn't disprove obviousness, and therefore the entire premise falls apart at its analysis. Thank you, Mr. Weir. Can I make one point? Thank you, Mr. Weir. Mr. Gunner, you have three minutes. Your Honor, first of all, the difference between the third office action and the first and second is clear. In the first and second, she talked about identical or nearly identical, or inherently the same. In the third office action, she never used identical. She always said nearly identical, highly similar, minimal differences, minor differences. And she clearly was talking about 103 at that point. And when the district court gave this alternative statement... What about her failure to withdraw 102? What weight, if any, should we put on that? She didn't. What about her failure to actually formally withdraw the 102 rejection? Your Honor, the case law makes it absolutely clear that that's not enough. On page 54 of our blue brief, we cite MP707.07e and also the Federal Circuit case Paperless Accounting v. Bay Area Rapid Transit System, and I quote from the latter, the examiner's rejection of the 196 patent for insufficient disclosure was not repeated or referred to in the third or subsequent office actions. The MPEP707.07e is not permissive in this requirement. There is no requirement to withdraw. It has to be repeated in order for it to be a rejection. And the fact is that Mr. Lynch and Mr. Weir are disagreeing on the point. What about the fact that she specifically withdrew in the preceding section a bunch of other 102 and 103 rejections, that that was unnecessary for her to do? No. If you look at the office action, you will see that the ones she expressly withdrew were the ones where the references were no longer applicable. In every case where a reference was still applicable, but for a different reason, like Mardigian, she persisted. That is a clear distinction between the two. Now, the fact that Mr. Weir talked about A20 and 21, where the judge gave an alternative holding, I have two comments about that. One is that given the judge's view 19 times that compositional difference was the essence of what was involved in this case, her mind... But what about the following statement that said, even if it's not, this is my finding? I mean, what about that? She clearly didn't ignore the possibility that the third office action no longer continued the 102 rejection. Isn't she clearly telling us in the alternative, this is where I come out on this? There are two problems with that. She says there be no question that inherency was the central dispositive question up to that point. It wasn't the central dispositive question up to that point. Even in the first and second office actions, you had a 102 rejection, you had a 103 rejection. The 102 rejection could have been distinguished by a compositional difference. And that's in fact what the examiner did. The examiner showed in the third office action that she regarded that 102 rejection as capable of being proven by a compositional difference. The district court judge said it wasn't possible. Mr. Dunner, I'm going to need to hold you to the time, as I did Mr. Weir. Thank you very much. Okay. Thank you.